**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**BILLIE JO SCARBROUGH,**

      **Plaintiff,**

**vs.**                              **Case No. 5:09cv208-RH/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/

<u>**REPORT AND RECOMMENDATION**</u>

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Billie Jo Scarbrough, applied for supplemental security income benefits on February 16, 2006. Plaintiff alleges disability due to bipolar disorder and depression, right knee pain, and right hand and shoulder pain. Plaintiff was nearly 37 years old at the time of the administrative hearing (on March 18, 2008), has a 12th grade education,

and has past relevant work for Walmart as a store floor cleaner, stock clerk, and truck loader. The Administrative Law Judge found that Plaintiff has "severe" impairments of degenerative joint disease of the right knee and depression, has the residual functional capacity to do a limited range of sedentary work, can do work as an assembler, inspector, surveillance system monitor, and packer, and thus was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1.   Is the individual currently engaged in substantial gainful activity?

2.   Does the individual have any severe impairments?

3.   Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.   Does the individual have any impairments which prevent past relevant work?

5.    Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[1]

Plaintiff testified that she was given the job of floor supervisor at Walmart, and

was supposed to be doing light duty, but she could not do the work as assigned and she

left the job.  R. 35-36.  She said that she hurt a shoulder muscle, with the injury going

down her back.  R. 37.  She last worked in 2005.  R. 40.

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw (which has annual editions), or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >.  Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm.  Social Security Rulings can be found at:  http://www.ssa.gov/OP_Home/rulings/rulfind1.html. The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

Plaintiff testified that her bipolar condition was "getting worse." R. 40. She said she had trouble remembering what she was doing. R. 41. She had been seeing Dr. Gillespie (actually advanced registered nurse practitioner) and Dr. Everett (actually licensed clinical social worker) for mental health treatment. *Id.* She said that Dr. Gillespie was a specialist in bipolar disorder, and gave her a medication that worked "real good," but one day she woke up "in my shop" and did not know where she was. R. 42. She said she had been to the hospital because she thought she was having heart attacks. R. 43. Plaintiff said that she got mad if she could not get what she wanted or could not remember something. *Id.* She said she got upset and would black-out, but did not know how long this lasted. R. 44. Plaintiff said that she wanted to be away from people. *Id.* She said that "sometimes I can't sleep for a week at a time," and had constant paranoid thoughts, that people did not like her. R. 45. She said she had panic and anxiety attacks, but had not had auditory or visual hallucinations for awhile. *Id.* She said that she gets a panic attack once a day lasting up to an hour, and she gets upset and ends up "breaking something." R. 46. She said that with medication, her symptoms were both getting worse (not being able to sleep for a week) and getting better. *Id.*

Plaintiff said that she had pain in her back. R. 47. She said that she had back pain every day from her neck to her tail bone. R. 50. She said that the pain was 10 on a scale of 10. *Id.*

Plaintiff said that after knee surgery in February, 2007, she had nerve damage and her foot "started dropping." *Id.* She uses two braces for her right foot. R. 48. She

cannot wear a brace when her knee is swollen, however.  *Id.*  She said her knee was

getting worse since the surgery.  *Id.*  She said that the physician was holding off

because he thought she was too young for a knee replacement.  *Id.*  She said she has

knee pain all of the time.  *Id.*  She said that walking for just "minutes" was too much

walking.  R. 49.  She took Percocet[2] and Flexeril[3] for her knee pain, but said that her

knee pain remained at 10 on a scale of 10 after medication.  *Id.*

Plaintiff said that she had a headache every day, all day.  R. 50-51.  She said

that she was given Depakote[4] for the headaches, and she had hair loss and gained

weight.  R. 51.

Plaintiff said that she had arthritis in her hands, and her hands were "not working

very good."  R. 52.  Some days, she said, she could not button a blouse or zip a jacket.

R. 53.  She said she could hold a knife and fork to feed herself when she could not

"drink a Slim-Fast."  *Id.*  She said that most of the time she could hold a comb or a

toothbrush.  *Id.*  She said it feels like needles in her hands and some of her fingers

would go numb or not work.  *Id.*  She said "when my bipolar is in full fledge nothing on

me hurts."  R. 54.

---

[2] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain.  It contains two drugs – acetaminophen and oxycodone.  Acetaminophen is used to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming effect and for pain.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[3] Flexeril is a muscle relaxant prescribed to relieve muscle spasms resulting from injuries such as sprains, strains, or pulls.  Combined with rest and physical therapy, Flexeril provides relief of muscular stiffness and pain.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[4] Depakote is used for manic episodes associated with bipolar disorder, epilepsy, and migraine headaches.   PHYSICIANS' DESK REFERENCE (2005).

Plaintiff testified that one of her physicians prescribed a cane for her so that she would not fall.  R. 54.  She said that sometimes she can stand for 45 minutes and sometimes for 5 minutes.  *Id.*  She said she uses a cane when her legs are not working.  R. 55.  She said that with her cane, she could walk "a good 25, 30 minutes."  R. 62.

Plaintiff testified that she sleeps about 1.5 hours on about 90% of the nights.  R. 56.  Sleeping medications have helped her to sleep "a good three hours."  R. 56-57.  Plaintiff said that after "the medicine kicks in," she can shower, dry herself, comb her hair, brush her teeth, and dress, but her partner ("Cat") opens bottles for her.  R. 57.  Her partner had to remind her to take her medications.  R. 61.  She said that she does part of the cooking and her partner does part of the cooking.  R. 57.  Plaintiff said that she can bring in the firewood.  *Id.*  Plaintiff does her own laundry.  R. 58.  She said that her roommate does most of the grocery shopping, but she sometimes does it.  *Id.*  She can carry the bags of groceries.  *Id.*  Her roommate keeps track of payment of bills.  *Id.*

Plaintiff said that she gets along with her roommate, has disowned everyone in her family, and does not have friends or neighbors with whom she socializes.[5]  R. 59.  She said that she gets along with her doctors, however.  *Id.*  She said that she can eat at a restaurant if she takes Xanax[6] and her bipolar medicine.  *Id.*  For a hobby, Plaintiff said she likes "taking things apart and putting them back together again."  *Id.*  She liked working on vehicles.  *Id.*  Plaintiff said that she cuts grass on a riding mower, but the

---

[5] She said: "I pretty much told them all go to hell."  R. 59.

[6] Xanax is a tranquilizer used in the short-term relief of symptoms of anxiety or the treatment of anxiety disorders. Anxiety associated with depression is also responsive to Xanax.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

vibration hurts her leg. R. 60. Plaintiff takes care of three dogs. R. 61. She watches television. R. 63. She said she cannot sit down very long. R. 64. She could lift and carry a gallon of milk. *Id.* She had a locked room where she kept cleaning materials for her truck, but would forget where she put the key. *Id.*

The vocational expert was asked to assume a hypothetical individual who was 34 years old (Plaintiff's age at the alleged onset), with a 12th grade education, and Plaintiff's work history. R. 66. The expert was also asked to assume that this person could do light work, but never climb, could frequently push and pull with the lower extremity and reach above the head, and must avoid environmental extremes and machinery hazards. R. 66-67. The hypothetical further assumed that person would have only occasional contact with co-workers and the general public. R. 67. Finally, it was assumed that the person ambulated with a cane. R. 68. The vocational expert said that such a person could do sedentary work as an assembler, inspector, and surveillance system monitor, and light work as a packer. R. 67-68. The expert said that if the person must have less than occasional contact with people, such a person (who must ambulate with a cane) could still do the surveillance system monitor sedentary job. R. 71.

**Medical evidence**

Plaintiff's medical records are all from the period that she was living in Delaware. The first medical note, from June 12, 2005, reflects that Plaintiff went to the hospital in Milford, Delaware, for a refill of Xanax. R. 204. She was found to be anxious, and the

diagnosis was anxiety. R. 205, 206. She was stable when discharged. R. 206. She was then taking Xanax, Flexeril, and Skelaxin.[7] R. 204.

On August 24, 2005, Plaintiff was seen by Frank Everett, a licensed clinical social worker, in Dover, Delaware.[8] R. 208. She related that she had a history of bipolar disorder and panic attacks. *Id*. It was noted that she had a history of alcohol abuse, but had been sober for the past 2.5 years. *Id*. She had suffered a history of domestic violence and sexual abuse. *Id*. and R. 211. During the mental status examination, it was determined that Plaintiff was seclusive, guarded, suspicious, labile, constricted, depressed, and anxious. R. 209. She also, however, was alert, had no preoccupations, hallucinations, or delusions, and was oriented. R. 210. It was thought that her common sense, impulse control, judgment, and intellectual and emotional insight were fair, but not good. *Id*. No diagnosis or GAF[9] score was given. R. 211.

On January 30, 2006, Plaintiff was seen at a neurology and musculoskeletal disorders clinic by Jay Freid, M.D., in Milford, Delaware. R. 283. She reported that she was "having a lot more arm pain." *Id*. It was getting weak and giving way. *Id*. Plaintiff also said her right knee was "still bothering" her. *Id*. Her mother was in hospice, and

---

[7] Skelaxin is prescribed "as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions." PHYSICIANS' DESK REFERENCE (2004), p. 2181, found on WestLaw.

[8] The practice also included three medical doctors and Michelle Gillespie, ARNP.

[9] Global Assessment of Functioning. Axis V of the DSM-IV Multiaxial System and the meaning of the GAF scores is explained at: http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

Plaintiff was helping her. *Id.* Plaintiff was then taking Xanax and Vicodin.[10] *Id.* On examination, Dr. Freid determined that Plaintiff was "diffusely tender over her right arm," but there was "good joint range of motion of all of her joints." *Id.* He could not test her right hand for weakness due to "some discomfort." *Id.* Her right knee had "some pain with movement," and there was tenderness behind the right knee, but there was no swelling. *Id.* Dr. Freid's impression was probable myofascial[11] pain with increased weakness. *Id.*

Plaintiff returned to Dr. Freid on February 2, 2006. R. 282. She still had "some pain in her shoulder," but the numbness was a little bit better and she was "getting around better." *Id.* She had taken Ambien, which had helped her sleep. *Id.* An MRI had been done on her knee. *Id.* On examination, Dr. Freid found that she had normal sensations in the upper extremities, diffuse trigger points in the right arm, and some pain with knee movement. *Id.* Dr. Freid's assessment was myofascial pain of the right upper extremity with tendinitis, and new onset numbness. *Id.* He discussed a home exercise program. *Id.* She was to return in a week for an EMG.[12] *Id.*

---

[10] Vicodin is a brand name for hydrocodone. Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[11] Myofascial is pertaining to or involving the fascia surrounding and associated with muscle tissue. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[12] Electromyogram. Electromyography is an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

The MRI of Plaintiff's right knee was conducted on February 3, 2006. R. 281. The menisci were normal, with no evidence of tear. *Id.* The ACL and PCL were normal. *Id.* The collateral ligaments were normal. *Id.* However, an osteochondral lesion involving 6 mm of the articular surface of the lateral femoral condyle was found, but the overlying cartilage was intact. *Id.* There was also a small popliteal cyst. *Id.*

On February 15, 2006, Plaintiff had an MRI of her right shoulder. R. 280. All of the findings were normal. *Id.* An MRI of Plaintiff's upper right extremity on the same date was normal. R. 279.

On March 8, 2006, Plaintiff was seen at a clinic in Delaware by Patrick A. Titus, M.D., who apparently was her primary care physician.[13] R. 459. He noted a past history for depression and anxiety, and left shoulder pain. *Id.* She was taking Xanax, Zantac,[14] Flexeril, Ambien, Mobic,[15] and Vicodin. R. 458. She had no edema in her extremities. *Id.* She had decreased range of motion in her left shoulder with discomfort. *Id.* Dr. Titus noted that her anxiety disorder was well maintained with Xanax. *Id.*

Also on March 8, 2006, Plaintiff returned to Dr. Freid. R. 278. She said she was still having "a lot of pain in her shoulders." *Id.* She reported that she still had a lot of stress at home. *Id.* She was trying to stay busy and said she was "doing a lot of

---

[13] Dr. Titus's medical records are at R. 426-459.

[14] Zantac is used to decrease the production of stomach acid, which may reduce irritation to the stomach lining and help heal ulcers and other gastrointestinal conditions. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[15] Mobic is a nonsteroidal anti-inflammatory drug (NSAID) in prescription form. It is used to relieve the pain and stiffness of osteoarthritis and rheumatoid arthritis. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

painting." *Id.* Physical examination revealed "some tenderness over her right trapezius," with "some mild pain with right shoulder movement." *Id.* Plaintiff also had "pain with right knee movement." *Id.* Dr. Freid suspected myofascial pain in the shoulder since the MRI was normal. *Id.* He thought that she had "knee pain or osteochondral lesion" of the right knee. *Id.* He cautioned Plaintiff not to overdo her activities. *Id.* Plaintiff was to return in one month. *Id.*

On April 5, 2006, Plaintiff returned to Dr. Freid. R. 277. She said that she had pain in her thumbs and that it hurt to move her shoulders. *Id.* She said she hurt when she "does too much." *Id.* She was trying to stay busy at home. *Id.* Plaintiff reported that she had a lot of stress from dealing with her former husband, who had partial custody of their daughter. *Id.* Plaintiff said that her former husband "used to abuse her and hit her many times." *Id.* Dr. Freid examined Plaintiff and found that she had "some pain with movement of her right knee" and with movement of her thumb. *Id.* She had good range of motion of her thumb. *Id.* Plaintiff was also "tender over her cervical paraspinals" but her right shoulder had better movement. *Id.* The diagnosis was "multiple musculoskeletal problems with a history of abuse of relationship." *Id.* Cervical and lumbar x-rays were recommended to exclude fracture from past trauma. *Id.*

On April10, 2006, there is report of a visit that appears to be to Dr. Raid Kofahi, in practice with Dr. Freid. R. 276. Plaintiff said that she had been having headaches for a long time, and at least three headaches a week. *Id.* She said that the pain was 4 to 7 on a scale of 10. *Id.* She said that "infrequently" the headaches were accompanied by photophobia, phonophobia, and pain from head movement. *Id.* "Sometimes" she was

nauseous and vomited. *Id.* She had tried Imitrex, but stopped taking it because it caused a tight feeling in her throat. *Id.* Plaintiff said that she had anxiety disorder or panic attacks, and bipolar disorder. *Id.* Plaintiff had smoked 1.5 packs of cigarettes for 22 years. *Id.* She claimed she was "on disability." *Id.* The physical examination by Dr. Kofahi, if there was one, is missing from this record.[16] *Id.*

On April 13, 2006, Plaintiff was seen by Glenn D. Rowe, D.O. R. 332.[17] Plaintiff said that she had been beaten for ten years by her husband, and attributed a lot of her problems to that abuse. *Id.* Dr. Rowe found a "palpable Baker cyst[[18]] in the posterior aspect of the [right] knee." *Id.* She had tenderness over the medial joint line and palpation over the patellar tendon. *Id.* She had no pain on patellar compression. *Id.* She had full extension and 115 degrees of flexion, and all other tests were negative. *Id.* She had no tenderness of the thumb. *Id.* She had dull sensation at S1, L4, and L5 of the lumbar spine, with tenderness over the lumbosacral junction, right sacroiliac junction, and right paralumbars. *Id.* She had weak hip flexion, but good hamstrings. *Id.* In the neck, Plaintiff had tenderness over the "paracervicals" and other areas of the neck. R. 333. Plaintiff had diminished strength of the right upper extremity. *Id.* Dr. Rowe reviewed x-rays of the cervical spine, finding no defects (within normal limits). R.

---

[16] The report appears to continue to at least one other page, but the page or pages are missing.

[17] For some reason, the record numbers from R. 322 through 339 in the lower right hand corner are very small. This also occurs elsewhere in the record.

[18] A Baker cyst is a swelling on the back of the knee, due to escape of synovial fluid that has become enclosed in a sac of membrane. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

333.  The x-ray of the lumbar spine and pelvis revealed leg length inequality (1/4 inch) and no fracture, but "some degenerative disk disease at L5-S1."  *Id.*  The x-ray of the right knee was unremarkable.  *Id.*  Dr. Rowe also mentioned the February 15, 2006, MRI results for Plaintiff's right knee (Baker cyst found) and right shoulder (normal).  *Id.* Dr. Rowe's impression was cervicothoracic strain, lumbosacral strain, Baker cyst right knee, degenerative disk disease at L5-S1, and right thumb strain.  *Id.*  Dr. Rowe recommended physical therapy, but Plaintiff said she had tried that and it had made her condition worse.  *Id.*  Plaintiff was "rather insistent upon getting the cyst on the right knee removed," but Dr. Rowe said that the cyst might reaccumulate after surgery.  *Id.*

An MRI of Plaintiff's head was conducted on April 25, 2006.  R. 275.  It revealed "two nonspecific areas of increased T2/FLAIR signal in the left frontal white matter, a non-specific finding."  *Id.*  Dr. Kofahi said that "[s]imilar lesions may be seen in patients with migraine," but other considerations were remote injury, demyelination or infection, and small vessel cerebrovascular disease.  *Id.*

On May 1, 2006, Plaintiff had an MRI of her cervical spine.  R. 330.  The results were minimal disc desiccation in the mid-cervical spine, without evidence of neural encroachment.  *Id.*  On May 3, 2006, Plaintiff returned to Dr. Freid.  R. 273. She was taking Zanaflex.[19]  He reported that she had taken Topamax[20] for headaches, but had to

---

[19] Zanaflex relaxes the tense, rigid muscles caused by spasticity. It is prescribed for people with multiple sclerosis, spinal cord injuries, and other disorders that produce protracted muscles spasms.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[20] Topamax is an antiepileptic drug, prescribed to control both the mild attacks known as partial seizures and the severe tonic-clonic convulsions known as grand mal seizures.  It is typically added to the treatment regimen when other drugs fail to fully control a patient's attacks.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

stop due to side effects. *Id.* He said that she reported that Percocet had caused a lot of headaches, and she had reduced the amount taken, which seemed "to make quite a difference." *Id.* On examination, Plaintiff had "some tenderness" over her lumbar paraspinals, and some pain with knee movement. *Id.* His assessment was myofascial pain, knee pain, and migraines. *Id.* He told Plaintiff that "all narcotics can cause migraines." *Id.* He again noted that the change in Percocet had worked a little bit better. *Id.* He had a number of recommendations, including surgery, how stress could aggravate the problem, new treatments for her bipolar disorder, and that she see a psychiatrist. *Id.*

Plaintiff returned to Dr. Rowe on May 16, 2006. R. 328. She was "very tender with palpation through the paracervicals, trapezius, levator, and over the scapula." *Id.* Movement of her neck was restricted to 10 degrees in any direction, and movement of the neck caused significant increase of pain and tightening of the muscles. *Id.* Significant pain was also noted in the lumbar examination, but strength was equal. *Id.* Dr. Rowe's impression was mild disk dessication of the cervical spine as shown by the MRI, strain of the cervical, thoracic, and lumbar regions, and right thumb, Baker cyst in the right knee, and degenerative disc disease at L5-S1. R. 329. Dr. Rowe prescribed a hinged knee brace to support her knee. *Id.*

On May 18, 2006, Plaintiff was seen by Dr. Kofahi for followup for her headaches. R. 270. He said he had given her Topamax, which she did not tolerate, and she was now taking Depakote, which "helped her headache significantly." *Id.* Dr. Kofahi said that Plaintiff's "bipolar disorder . . . had improved significantly with

Depakote." *Id.* Plaintiff had normal strength in upper and lower extremities. *Id.* Her gait was normal. *Id.*

On May 23, 2006, Plaintiff had an MRI scan of her lumbar spine. R. 326. The impression was multiple endplate Schmorl's nodes,[21] which could be seen with juvenile discogenic disease, and small annular disc bulges at L2-L3, and L3-L4, with no significant central or foraminal spinal stenosis,[22] and a small central disc protrusion at L5-S1, with no displacement of either S1 nerve root. R. 326-327. The findings of disc degeneration from L1 through L5 were mild. R. 326.

On May 25, 2006, a CT scan was performed of Plaintiff's right knee. R. 335. There was no evidence of osseous lesions, no evidence of a cyst within the distal femur or proximal tibia, no lytic lesions demonstrated, and no soft tissue masses detected. *Id.* The impression was "degenerative changes most marked involving the lateral femoral condyle with small subchondral cysts and sclerosis of the articular surface." *Id.*

Also dated May 25, 2006, there is a note of a telephone message to Dr. Rowe. R. 329. The note states that there was a CT scan that morning, and "nothing was seen," but a lump was felt in the knee, and surgery was wanted. *Id.* The reply to Plaintiff's partner, probably from Dr. Rowe, was: "I can't do surgery to remove something that can't be seen or understood." *Id.*

---

[21] A Schmorl's node is a nodule or little knot seen in radiographs of the spine, due to prolapse of nucleus pulposus into an adjoining vertebra. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[22] Stenosis is an abnormal narrowing of a duct or canal. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

On May 31, 2006, Plaintiff returned to Dr. Rowe.  R. 325.  Plaintiff was wearing the knee brace and said it was helpful.  *Id*.  She had pain in the knee with bending.  *Id*. Plaintiff said that she needed to sit every 15 to 30 minutes to rest due to lower back pain.  *Id*.  She had been working at Walmart cleaning the floors, but the work aggravated her condition and she was not then working.  *Id*.  Dr. Rowe's impression was L5 to S1 small central disc protrusion, multiple end plate Schmorl's nodes with juvenile discogenic disease, a small disc bulge at L2-L3 and L3-L4, degenerative changes in the knee, mild disc dessication of the cervical spine, cervical thoracic and lumbosacral strain, and right thumb strain.  *Id*.  Dr. Rowe recommended that Plaintiff work hard to increase her range of motion and that she find employment with light duty restrictions.  *Id*.

On May 31, 2006, Plaintiff was also seen by Dr. Freid.  R. 269.  Plaintiff said that Depakote had helped "a lot with her bipolar."  *Id*.  Plaintiff did not think she could work and was thinking of reapplying for disability.  *Id*.  On physical examination, Dr. Freid found "some trigger point over her left trapezius," "some mild pain with knee movement," and "some tenderness over her lumbar paraspinals."  *Id*.

On July 25, 2006, Plaintiff was seen again by Dr. Freid.  R. 268.  She said she still had a lot of pain, and had had a stressful month, staying with sick relatives.  *Id*.  She felt that she was losing memory and had trouble concentrating.  *Id*.  She had diffuse trigger points, but her right shoulder had good movement.  *Id*.  The assessment was knee and shoulder pain and anxiety disorder.  *Id*.  Dr. Freid said he still thought

psychiatric care might be useful, but Plaintiff had never been interested. *Id.* He discussed stretching for myofascial pain. *Id.*

On July 26, 2006, Dr. Kofahi saw Plaintiff. R. 266. She was having more headaches, but not like before she started taking Depakote. *Id.* Plaintiff reported that sometimes she got angry and mean, but she was not seeing a psychiatrist. *Id.* On examination, she was found to have normal strength in both upper and lower extremities. *Id.* Her sensation to pinprick, temperature, and vibration was symmetrical. *Id.* Dr. Kofahi wanted Plaintiff to increase the dosage of Depakote, but she and her partner wanted her to stay on the same dosage. *Id.*

On August 22, 2006, Plaintiff was seen again by Dr. Kofahi. R. 265. Everyday, Plaintiff was drinking a lot of soda with sugar, and coffee with a lot of sugar (36 teaspoons). *Id.* Dr. Kofahi noted that Dr. Freid saw her for chronic pain. *Id.* On examination, she was found to have normal strength in both upper and lower extremities, and her gait was normal. *Id.* His assessment was migraine headaches, controlled with Depakote. *Id.* Plaintiff said she could not get to sleep until 5 a.m. *Id.* She was using Lunesta[23] for sleep. *Id.* Dr. Kofahi said that sleep deprivation could trigger a migraine. *Id.* He planned to wean Plaintiff from Depakote and switch her to Neurontin.[24] *Id.* The last page of the record from this date of treatment is missing.

_____

[23] Lunesta is prescribed for insomnia, defined as the inability to fall asleep or stay asleep. It's used for adults who have trouble getting to sleep, wake frequently during the night, or wake up too early in the morning. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[24] Neurontin has two uses. First, it may be prescribed with other medications to treat partial seizures (the type in which symptoms are limited). It can be used whether or not the seizures eventually become general and result in loss of consciousness. Second, it

On September 12, 2006, Plaintiff was examined on a consultative basis by Janie

Chester, M.D., for a mental status evaluation. R. 246-250. Plaintiff reported that her

parents were alcoholics, and she and her siblings were often beaten by her parents. R.

246. She reported that she was very angry during childhood, and was treated with

Prozac and Zoloft during her teenage years. *Id.* She began drinking alcohol on a

regular basis, and discontinued the medications. *Id.* She and her husband physically

fought when drunk. *Id.* Plaintiff said that she became an alcoholic in her teen years,

and stopped at age 32 when she divorced her husband because she did not want her

daughter to have two drunks for parents. R. 247. Plaintiff reported that she continues

to have little control over her temper, and she fights with her girlfriend. *Id.* Plaintiff said

that she had memory trouble, which she attributed to her "bipolar disorder." *Id.* Plaintiff

apparently lost custody of her daughter after a court-ordered psychiatric evaluation. *Id.*

She had not had continuous psychological treatment. R. 247-248. Plaintiff said she

relied upon her girlfriend to shop because she herself did not want to be around crowds.

R. 248-249. The mental status examination revealed that Plaintiff did not know the

date, day, or year, and did not know precisely where she was. R. 249. She had some

short term memory problems. *Id.* Dr. Chester's impression was alcohol dependence, in

remission, victim of abuse, cognitive disorder not otherwise specific versus malingering.

*Id.* She assigned a GAF score of 50.[25]

---

can be used to relieve the burning nerve pain that sometimes persists for months or
even years after an attack of shingles (herpes zoster). PDRhealth™, PHYSICIANS
DESKTOP REFERENCE.

[25] A GAF score of 41-50 indicates: "Severe symptoms ( e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting ) OR any serious impairment in social,

Dr. Chester also filled out a mental residual functional capacity form. R. 251. She thought that Plaintiff's ability to relate to other people and to perform work in frequent contact with others was severely impaired. *Id.* She said that Plaintiff had moderate limitations in her ability to engage in activities of daily living (work around the house, socialize with friends), to comprehend and follow instructions, and to perform complex tasks. *Id.* Moderate was defined as affecting the activity by not precluding the ability to function. R. 252.

Plaintiff was seen by Dr. Rowe on September 14, 2006. R. 324. She said she had to have a brace on her knee because without a brace, the knee would give out and she would fall. *Id.* Dr. Rowe said that her right knee lacked the final 20 degrees of extension and had 118 degrees of flexion. *Id.* There was tenderness in the knee. *Id.* Plaintiff had limited cervical extensions and flexion, and stopped the examination due to pain. *Id.* The assessment was the same as on May 31, 2006. *Id.* Dr. Rowe recommended that Plaintiff attend physical therapy 3 times a week for 4 weeks for evaluation and treatment. *Id.* Right knee arthroscopy was discussed. *Id.*

Plaintiff was seen again by Dr. Freid on September 19, 2006. R. 264. She was back on Depakote because when she stopped, she became worse. *Id.* The impression was chronic knee pain and bipolar disorder. *Id.* He recommended that she see a psychiatrist, who could suggest other drugs for bipolar disorder. *Id.*

---

occupational or school functioning ( e,g., no friends, unable to keep a job )." A GAF score of 51-60 indicates: "Moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) OR moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers). *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

On September 23, 2006, a non-examining state agency physician reviewed Plaintiff's medical records.  R. 235-241.  He determined that Plaintiff was capable of performing light work (carry 20 pounds, frequently carry 10 pounds, sitting and stand for 6 hours),[26] with some limitations.  R. 236-238.

On September 27, 2006, Plaintiff was seen again by Dr. Titus.  R. 457.  He noted that she was then taking Depakote, among other medications.  *Id*.  She had no edema in her extremities.  *Id*.  Decreased pain on palpation was noted, but the part of the body is illegible.  *Id*.  It was noted that Plaintiff was to schedule surgery for the removal of a Baker's cyst on her right leg.  *Id*.  Dr. Titus said that Plaintiff had chronic back pain with pain management, and suffered from anxiety and bipolar disorder.  *Id*.  He referred her to a psychiatrist for further management.  *Id*.  Chronic myalgia and arthralgia of Plaintiff's left shoulder was noted, as well as migraine headaches, depression, and anxiety.  R. 456.

On October 2, 2006, Plaintiff was seen by Dr. Titus.  R. 454.  She had fever and a cough.  *Id*.  The diagnosis was acute bronchitis.  R. 455.  Chronic back pain, migraines, depression, and anxiety were noted.  R. 454.  She had discomfort on range of motion of her lumbar spine.  R. 455.

On October 17, 2006, Plaintiff was seen again by Dr. Freid.  R. 263.  She was still having pain and got depressed at times.  *Id*.

On November 2, 2006, Plaintiff was seen by Dr. Kofahi.  R. 261.  He noted that while her migraines had significantly improved on Depakote, she had weight gain and

---

[26] *See*, 20 C.F.R. §§ 404.1567(b) and 416.967(b), for the definition of "light work."

hair loss. *Id*. He said that she could not tolerate Neurontin or Topamax either. *Id*. He changed her medication to a calcium channel blocker, Verapamil.[27] *Id*. Dr. Kofahi said that Plaintiff was seeing a psychiatrist for her bipolar disorder. *Id*.

On November 2, 2006, Dr. Titus saw Plaintiff. R. 452. She complained of weight gain and hair loss with medication. *Id*. She also continued to complain of osteoarthritis. R. 453.

On November 3, 2006, Dr. Titus wrote a letter stating that Plaintiff was "unstable [sic] to work." R. 253. He said that she had "torn muscles and arthritis in various parts of her body to bi-polar disorders." *Id*. He said that Plaintiff was then a patient. *Id*.

On November 14, 2006, Plaintiff was seen by Dr. Freid. R. 260. She was to have knee surgery soon. *Id*. It was noted that she was seeing Dr. Weiss and he prescribed Abilify[28] and Wellbutrin,[29] but she had stopped both due to side effects. *Id*. She was then taking Soma[30] (for pain) with some side effects and was seeking a new psychiatrist. *Id*. On examination, she was found to have "some tenderness over her

---

[27] Verapamil is a calcium channel blocking agent used as the hydrochloride salt as a coronary vasodilator in the treatment of angina pectoris and of hypertension and the treatment and prophylaxis of supraventricular tachyarrhythmias. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[28] Abilify is indicated for the treatment of schizophrenia. PHYSICIANS' DESK REFERENCE (2005).

[29] Wellbutrin is indicated for treatment of depression. PHYSICIANS' DESK REFERENCE (2005).

[30] Soma is used, along with rest, physical therapy, and other measures, for the relief of acute, painful muscle strains and spasms. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

right knee," "some pain with movement," and "pain over her right shoulder." *Id*. The diagnosis was myofascial pain and bipolar disorder. *Id*.

On December 1, 2006, Dr. Rowe said that Plaintiff was scheduled for arthroscopic surgery "to remove loose bodies in the right knee." R. 323. Plaintiff had telephoned and said that she was in "extreme pain" and seemed to have developed another lesion in her knee. *Id*.

On December 5, 2006, Plaintiff was seen by Dr. Rowe. R. 322. Plaintiff reported that she had pain radiating the length of her right leg into the buttock to her foot with numbness in the foot. *Id*. She had a sense of weakness in the lower extremities. *Id*. Her symptoms had begun with a fall three weeks earlier at home. *Id*. She was walking with an antalgic gait listing slightly to the left. *Id*. She had a positive "bench" test on the right. *Id*. There was right SI joint tenderness, and mild trochanteric tenderness on the right. *Id*. He noted that Plaintiff was "too uncomfortable to assess for range of motion." *Id*. His assessment was sciatica; L5-S1 small disc protrusion, multiple endplate small nerve with juvenile discogenic disease, small disc bulge at L2-L3 and L3-L4 per MRI of May 23, 2006; degenerative changes most marked involving the lateral femoral condyle and small subchondral cyst and sclerosis of the articular surface per a CT scan of the right knee of May 25, 2006; mild disc desiccation, MRI of the C-spine of May 1, 2006; cervicothoracic and lumbar strain; and right thumb strain. *Id*. An MRI was needed, but Plaintiff was too uncomfortable to sit for the study. *Id*. He prescribed a prednisone Dosepak. *Id*.

On December 12, 2006, Dr. Freid again examined Plaintiff.  R. 259.  He found some pain with movement of the right knee and diffuse pain over the right shoulder.  *Id*. His assessment was myofascial pain and chronic knee pain.  *Id*.  He recommended removal of the knee cyst, but recommended that Plaintiff avoid a knee replacement.  *Id*.

On January 9, 2007, Plaintiff was seen by Dr. Freid.  R. 258.  He reiterated that she had a lot of knee pain, her shoulders bothered her, she was a little bit depressed, got angry very easily, and had migraine headaches.  *Id*.  On examination, he found "some pain over her right knee" and "some tenderness over her right shoulder" with trigger points there.  *Id*.  His assessment was bipolar disorder, chronic shoulder pain, and migraine headache.  *Id*.  He discussed changing psychiatrists (mental health providers).  *Id*.

On January 10, 2007, Plaintiff was seen by Dr. Titus.  R. 450-451.  She was having episodes of anxiety, depression, and anger.  *Id*.

Dr. Rowe saw Plaintiff on January 25, 2007.  R. 321.  Plaintiff said she could not wear the knee brace as instructed due to pain behind her knee.  *Id*.  She said that the knee was very unstable.  *Id*.  On examination, two masses were noted, one at the proximal tibia and posterior aspect of the right knee, and the other at the distal femur in the back of the knee, with grade I effusion.  *Id*.  Dr. Rowe's assessment was osteochondral lesion and sclerosis of the articular surface according to a CT scan of the right knee on May 25, 2006; mild disk desiccation according to MRI and CT scans of the spine on May 1, 2006, cervical, thoracic, lumbar, and right thumb strain.  *Id*.  Dr. Rowe discussed with Plaintiff whether to schedule arthroscopic surgery.  *Id*.

On February 5, 2007, Plaintiff returned to see Dr. Freid.  R. 257.  She was to have knee surgery in a few days by Dr. Rowe.  *Id.*  She still was not seeing a psychiatrist.  *Id.*  She had some pain with knee and shoulder movements.  *Id.*

On February 6, 2007, Plaintiff had knee surgery.  R. 340-341.

Plaintiff returned to Dr. Freid on February 13, 2007.  R. 256.  She said that her pain medications had not been working as well since the surgery, and she did not sleep as well.  *Id.*

On February 28, 2007, Plaintiff was seen by Dr. Rowe "because of a worsening of her condition."  R. 317.  Her dog had grabbed her crutch, causing a twisting injury to her right knee, and since then, she had experienced excruciating pain.  *Id.*  On examination, she was found to have grade II effusion and tenderness to palpation.  *Id.*  Dr. Rowe provided a cortisone injection to the knee.  *Id.*

On March 13, 2007, Plaintiff returned to Dr. Titus with fatigue, fever, and a cough.  R. 448-449.  She had pain (myalgia, arthralgia) in her lumbar spine.  R. 448.  She had pain with range of motion testing of her lumbar spine.  R. 449.  The diagnosis was acute bronchitis, chronic back pain (mostly stable with no evidence of worrisome symptoms, said Dr. Titus), and migraine headaches.  *Id.*

On April 2, 2007, Plaintiff was seen by Dr. Freid.  R. 415.  There was less swelling in her right knee, but she was tender over her right shoulder.  *Id.*

On April 5, 2007, Plaintiff had had another fall on the right knee, but had been doing well until the fall.  R. 315.  Dr. Rowe's impression was left knee mild degenerative

joint disease, right shoulder tendinitis or bursitis, and other findings noted above were repeated. *Id.*

On April 17, 2007, Plaintiff was seen by Dr. Titus. R. 446-447. It was noted that she had right foot drop and decreased range of motion of her cervical and lumbar spine. R. 447.

On April 19, 2007, Dr. Rowe found that Plaintiff's knee had a stable joint, with grade I effusion, but with pain. R. 314. He gave her a Supartz injection. *Id.*

On April 20, 2007, Plaintiff had an MRI of her left knee. R. 312. Subcortical marrow edema was noted that might be secondary to direct trauma to the region. *Id.* No meniscal tear was identified. *Id.*

On April 30, 2007, Plaintiff told Dr. Freid that her right knee was "bothering her some." R. 414. She had been going to a licensed clinical social worker (Everett), and enjoyed this, and her mood was better. *Id.* On examination, she had "some pain with right knee movement." *Id.* Her swelling was "much better," she was using a brace, and she was found to be "walking much better." *Id.*

On May 10, 2007, Plaintiff made a routine visit to the clinic of Dr. Titus with no new complaints. R. 446. Plaintiff was found to have pain in her cervical and lumbar spine. *Id.* Migraine headaches, anxiety disorder, bipolar disorder, depression, and back pain were noted in her medical history. *Id.* It was noted that her anxiety disorder was well controlled with Xanax and her migraine headaches were clinically stable with

Fiorinal.[31]  R. 445.  She was to continue with pain management for her chronic back pain.  *Id.*

On May 24, 2007, Dr. Rowe again saw Plaintiff.  R. 309.  She was using a Q brace on her knee.  *Id.*  She said that she continued to fall and her knee "gave out" under her.  *Id.*  On examination, she was found to be "quite tender across the patellar tendon and along the medial and lateral retinacular areas," and also was "quite tender across the quadriceps tendon."  *Id.*  X-rays revealed no acute abnormalities, such as fractures.  *Id.*  Dr. Rowe opted to give her a fourth Supartz injection.  *Id.*  A fifth injection was given by Dr. Rowe on May 31, 2007.  R. 308.

On May 24, 2007, Plaintiff was seen by Michelle Gillespie, ARNP, for mental health treatment at Frank Everett & Associates.  R. 423-426.  She told Ms. Gillespie that she had racing thoughts, anger, mood swings, depression, and wanted to hurt people.  R. 423.  She denied suicidal thoughts but had past homicidal thoughts.  *Id.* and R. 426.  She had not had alcohol for three years.  R. 423.  She smoked 1.5 packs of cigarettes a day.  R. 424.  Her eye contact was decreased, but she was friendly, cooperative, and spontaneous.  *Id.*  Her speech was coherent, relevant, and normal.  *Id.*  Her affect was flat and depressed.  *Id.*  She was found to be alert, oriented, but with inadequate attention and concentration at times, but her memory was intact and her intelligence average.  R. 425.  The diagnosis was bipolar disorder, and a current GAF of 50 was assigned, with the highest GAF in the past year of 60.  R. 426.

---

[31] Fiorinal is used for the relief of tension headache symptoms caused by muscle contractions in the head, neck, and shoulder area.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

On May 25, 2007, Plaintiff was seen by Dr. Freid.  R. 413.  She said she was "still having some pain at times," but the medicines "seem to be helping some."  *Id.*  She reported "a lot of knee pain."  *Id.*  On examination, however, Dr. Freid noted only "some pain" on knee movement.  *Id.*

On June 11, 2007, Plaintiff was seen again by Dr. Rowe.  R. 306.  She had fallen three times and had difficulty sleeping.  *Id.*  Her knee was very swollen, it constantly "gave out," and she had 10 to 15 muscle spasms in that leg each day.  *Id.*  Plaintiff could not be weighed because she could not stand due to pain.  *Id.*  Grade I effusion was noted in her knee, and Plaintiff reported a "severe amount of pain with palpation to the medial and lateral joint line around the knee, patellar tendon, and patellar compression."  *Id.*

On June 22, 2007, Plaintiff was seen by Dr. Freid.  R. 412.  She said that her knees "have been bothering her more."  *Id.*  She seemed quite tired as she had not slept in a few days.  *Id.*  Plaintiff had pain with knee movement and was tender over her lumbar paraspinals.  *Id.*

On July 18, 2007, Plaintiff was again seen by Dr. Freid.  R. 411.  She still had pain, but the medicines seemed to help.  *Id.*  She reported that she still had a lot of muscle spasm and was taking Flexeril.  *Id.*

On July 19, 2007, Dr. Rowe said that Plaintiff denied that she had any further knee pain, but "describes chronic instability."  R. 304.  She told Dr. Rowe that she wears the knee brace all of the time, and if she did not, her knee would give out.  *Id.*  She said her right knee gave out twice a week, causing falls.  *Id.*  She reported swelling with a "lot

of walking." *Id.* She had been doing pool exercise, which had helped. *Id.* On examination, it was observed that Plaintiff had foot drop on the right. *Id.* An EMG done on July 11, 2007, was reviewed. *Id.* The EMG "revealed peroneal nerve neuropathy without current ongoing denervation or reinnervation." *Id.* Dr. Lieberman, who performed the EMG, thought that the peroneal nerve would not get any better and would not improve with surgery. *Id.* Plaintiff declined formal physical therapy, stating that she could do the exercises on her own. *Id.* She also declined an injection. *Id.* Dr. Rowe recommended an MRI to rule out ligament or meniscal tear due to the chronic giving way and instability of Plaintiff's knee. R. 304-305.

On August 17, 2007, Dr. Freid examined Plaintiff. R. 410. He found that her right knee had some pain with movement, and she had "very minimal ankle dorsiflexion and decreased sensation in her foot." *Id.* She was still having a lot of falls because her knee was weak. *Id.* Dr. Freid discussed "poor mobility" with Plaintiff, and said he wanted her to "get in therapy to work with immobility." *Id.*

On August 21, 2007, Plaintiff returned to Dr. Titus. R. 443-444. She had burned her forearm while repairing a car. R. 443. She was found to have decreased range of motion of her cervical and lumbar spine. *Id.*

On September 14, 2007, Dr. Freid said Plaintiff's medicines were not working as well and she was "having some pain at times." R. 409. Plaintiff said she did not want to go to therapy. *Id.* Dr. Freid discussed therapy, and said it was important to Plaintiff's safety, that injuries from falls "are the worst problems." *Id.* He discussed limitations

with use of narcotics.  *Id.*  He told Plaintiff that she needed "to do more for herself to prevent problems."  *Id.*

On September 17, 2007, Plaintiff was seen again by Dr. Titus.  R. 442.  It was a routine followup with no new complaints.  *Id.*  She was found to have pain in her cervical and lumbar spine, foot drop on the right, migraine headaches, anxiety disorder, bipolar disorder, and chronic back pain.  *Id.*

On October 10, 2007, Dr. Freid said Plaintiff was "still having some pain at times."  R. 408.  On examination, she had "some tenderness over her right knee."  *Id.*  Her medicines seemed to be helping, and she was seeing a psychiatrist.  *Id.*  His assessment was "chronic pain."  *Id.*

On October 25, 2007, Plaintiff returned to Dr. Titus for a followup for chronic cervical and lumbar spinal pain.  R. 440.  She had decreased range of motion of her cervical and lumbar spine, with pain.  R. 441.  Dr. Titus again noted that Plaintiff's migraine headaches and anxiety disorder were well-controlled with Fiorinal and Xanax.  *Id.*  She was to continue with pain management for her chronic back pain.  *Id.*

On October 26, 2007, Plaintiff was again seen by Dr. Rowe.  R. 303.  Her symptoms (foot drop, need for a knee brace, giving out, swelling, pain) were unchanged.  *Id.*  Dr. Rowe gave her a cortisone shot.  *Id.*

On November 7, 2007, Dr. Freid said that Plaintiff was going to "Frank Everett & Associates" for mental health care.  R. 407.  She had pain with movement of her knees.  *Id.*

On November 28, 2007, Dr. Titus said that Plaintiff's anxiety and bipolar disorders were currently stable. R. 439. He said Plaintiff's chronic back was clinically stable on current pain management, though she had pain and decreased range of motion in her back. *Id.* She saw Dr. Titus as a followup for chronic back and neck pain. R. 438.

On December 5, 2007, Dr. Freid said that Plaintiff said her knees had been bothering her a lot. R. 406. She had been put on a new medicine by her psychiatrist, did "really poorly," and "was acting very hateful." *Id.* She had some pain on knee movement. *Id.*

On January 4, 2008, Plaintiff told Dr. Freid that her medicines did not work "that great anymore." R. 405. She had lost her cane and could not afford another one. *Id.* She was not wearing a knee brace, was not seeing a psychiatrist, and had "a lot of pain in her back and shoulder." *Id.* Some pain with movement of her right knee was observed. *Id.*

On January 23, 2008, Dr. Titus saw Plaintiff. R. 436-437. She had no new complaints except for ongoing neck and back pain. R. 436. She had decreased range of motion with pain in her back. R. 437.

On February 7, 2008, Michelle Gillespie, who works for Frank Everett & Associates, prepared a mental impairment residual functional capacity assessment. R. 416-421. She said that she had last seen Plaintiff on September 25, 2007. R. 416. She assigned a GAF of 55 as the highest in the prior year. *Id.* She said that Plaintiff had flat affect, poor eye contact, depressed mood, anger, depression, anxiety, and

homicidal thoughts.  R. 417.  She said that Plaintiff was not a malingerer.  *Id.*  Plaintiff

had made no complaints about side effects of medications, but GI upset and drowsiness

were noted.  *Id.*  Ms. Gillespie's prognosis was guarded to poor.  *Id.*  She said that

Plaintiff's psychiatric condition exacerbated her experience of pain from migraine

headaches.  *Id.*  She thought that Plaintiff would be absent from work more than three

times a month for her impairments and treatments.  R. 418.  Filing out a checklist, Ms.

Gillispie said that Plaintiff had poor to no ability to carry out very short and simple

instructions, to maintain attention for two hour segments, to maintain regular attendance

and be punctual, to sustain an ordinary routine without special supervision, to work in

coordination with or in proximity to others without being unduly distracted, to complete a

normal workday without interruptions from psychologically based symptoms, to accept

instructions, to get along with co-workers, to respond properly to changes in routine

work, to deal with normal work stress, and to interact appropriately with the general

public, to maintain socially appropriate behavior.  R. 418-419.  She thought that Plaintiff

had marked restrictions of activities of daily living, extreme limitations in maintaining

social functioning, and suffered continual episodes of deterioration and decompensation

in a work setting.  R. 420.

On February 18, 2008, Dr. Titus saw Plaintiff again.  R. 434-435.  It was a

followup visit with no new complaints.  R. 434.  Plaintiff had decreased range of motion

of her cervical and lumbar spine with crepitus and pain and foot drop.  R. 435.  She was

to continue with pain management for now, and consider a referral to orthopedic

surgery for a second opinion.  *Id.*

On March 14, 2008, Dr. Titus completed a physical residual functional capacity assessment. R. 427. When asked to state the nature, frequency and length of contact with Plaintiff, he said: "monthly visits and as needed." *Id.* His diagnosis (to the extent that I can read it) was chronic back pain, knee pain, foot drop, and bipolar disorder, and his prognosis was fair to poor. *Id.* He said that Plaintiff was not a malingerer. *Id.* He said that emotional factors did not contribute to Plaintiff's functional limitations, but then said depression affected her physical condition. *Id.* He said that Plaintiff's symptoms were constant, and that she was incapable of tolerating even a low stress job because Plaintiff has "severe bipolar disorder." R. 428. Dr. Titus thought that Plaintiff could sit continuously for no more than 15 minutes and stand for no more than 15 minutes. *Id.* He thought that she could sit and stand or walk for less than 2 hours in an 8 hour work day. *Id.* He said that Plaintiff cannot work. R. 429. He said that with prolonged sitting, Plaintiff needed to elevate her legs to 45 degrees. *Id.* He said that Plaintiff had significant limitations doing repetitive reaching, handling, or fingering. *Id.* He said that Plaintiff has only bad days. *Id.* He concluded that Plaintiff was not fit for work. R. 430. When asked to describe other limitations, he said that Plaintiff "has severe depressive disorder." *Id.*

On March 24, 2008, Dr. Titus again saw Plaintiff. R. 432-433. She was there for a followup for ongoing pain in her back, neck, right shoulder, and bilaterally in the knees. R. 432. Plaintiff had decreased range of motion in her cervical and lumbar spine with discomfort. R. 433. Dr. Titus's assessment was cervical and lumbar spinal

pain, not fully stable, with a recommendation that Plaintiff continue with pain

management.  R. 433.

**Legal analysis**

> **Whether the ALJ's reasons for discounting the opinion of Dr. Titus, a treating physician, are supported by substantial evidence**

Plaintiff contends that the ALJ erred in failing to give controlling weight to the

opinion of Dr. Titus.  Doc. 19, p. 19.  The opinion of a claimant's treating physician must

be accorded considerable weight by the Commissioner unless good cause is shown to

the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so

because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a

"detailed, longitudinal picture" of impairments is the length of the treatment relationship,

the frequency of examination, the extent of the knowledge of the treating source as

shown by the extent of examinations and testing, the evidence and explanation

presented by the treating source to support his or her opinion, the consistency of the

opinion with the record as a whole, and whether the treating source is a specialist with

respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be

supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir.

1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th

Cir. 2004). "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986). "Where the Secretary has ignored *or* failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." *Id.* (emphasis added); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL 635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD). *Compare*, Harris v. Astrue, 546 F.Supp.2d 1267 (N.D. Fla. 2008) (No. 5:07cv44-RS/EMT) (remanding because the ALJ gave improper reasons to discount the opinion of a treating physician, but did not ignore it).[32] *But see,* Cole v. Barnhart, 436 F.Supp.2d 1239 (N.D. Ala. 2006) (finding that the opinions of the treating physician must be accepted as true where the ALJ "did not properly refute them.").

The Administrative Law Judge gave the following reasons for discounting the opinion of Dr. Titus as to Plaintiff's physical residual functional capacity:

> The claimant's physical limitations are also not work-preclusive. In a medical source statement Patrick Titus, M.D., wrote that the claimant can sit less than two hours during an eight-hour workday and cannot frequently lift any amount of weight (Exhibit 22F). However, these limitations are refuted by the claimant's own statements. In Exhibit 1E the claimant admits that she takes out the garbage, washes dishes, sweeps the floors, and cares for her animals (although these tasks take her an inordinate amount of time due to allegedly poor concentration). The claimant also admits that she gets around by walking (Exhibit 1E). Finally, in her written application the claimant claimed problems due to her right shoulder, right knee and right thumb but indicated that such problems did *not* impair her ability to sit. She also did not indicate in Exhibit 1E that she

---

[32] Harris distinguished MacGregor as a case where the ALJ made no finding as to the weight of the opinion of the ALJ, *i.e.*, he *ignored* the opinion. 786 F.Supp.2d at 1282.

needed a cane or a brace.  In general, the treating source medical evidence shows that the claimant's physical conditions limits her to a range of sedentary work but does not prevent her from performing all work.

R. 23.

Plaintiff concentrates her arguments with respect to the rejection of Dr. Titus's opinion solely upon the findings in the paragraph quoted above concerning the evidence of Plaintiff's usual daily activities.  Doc. 19, pp. 19-20.  The findings come entirely from Exhibit 1E (R. 132-139).  This Exhibit, "Function Report-Adult," Form SSA-3373-BK, is dated February 16, 2006.  Plaintiff said on this form that during the day, she cleaned the house and fed her animals.  R. 132.  She went outside the home in the morning, and came back in around 2:00 to 3:00 p.m.  *Id.*  She said she had no problem with personal hygienic care.  R. 133.  She was able to prepare simple meals for herself.  R. 134.  She said that she could take the garbage out, wash dishes, sweep the floors, and take care of her animals, though it took all day because she had problems with concentration.  *Id.*  She said that she walked and rode in a car when she went out, but she could not drive.  R. 135.  She said she could not do any chores related to bills and money.  *Id.*  She talked with others daily on the telephone.  R. 136.  She needed reminders for appointments and needed someone to go with her to appointments.  *Id.*  She said that she cannot remember to finish what she starts or instructions.  R. 137.  She said she could not follow spoken instructions well at all.  *Id.*  Plaintiff did not, however, indicate that she had any problems with walking, standing, or sitting.  *Id.*  In summary, Plaintiff's description of daily activities on February 16, 2006, indicated significant problems with

concentration and attention to task, Plaintiff said she could do housework and her ability to sit, stand, and walk was not impaired.

But Plaintiff's description of her daily activities did not cover the period when the medical evidence reflects a worsening of Plaintiff's knee impairments (2007 and 2008), when she was prescribed a cane for walking and had suffered permanent damage to a motor nerve in her knee. The Eleventh Circuit has repeatedly cautioned that evidence of daily activities must be cautiously considered. Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work."); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (the court must consider the entire record when determining whether the evidence of a claimant's daily activities is substantial evidence for the conclusion that she retains the residual functional capacity to work); Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("Nor do we believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability or is inconsistent with the limitations recommended by Lewis's treating physicians."); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (when considering daily activities, the entire record must be considered, including the claimant's testimony that she had to lie down after two hours of such work); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (a conclusory citation to a claimant's "daily activities" as a basis for failing to believe her testimony as to pain was insufficient where there was a medical condition that reasonably could have given rise to the pain described, and, although she testified that she cooked and shopped for herself, she had trouble putting on her

clothing). Thus, Plaintiff's statements in Exhibit 1E are not substantial evidence in the record to discount the opinion of Dr. Titus, a treating physician.

This "daily activities" discussion, however, was followed by a discussion of the medical evidence. Plaintiff has not addressed the adequacy of these findings to discount the opinion of Dr. Titus. The ALJ noted that on March 8, 2006, Plaintiff had a cyst at the back of her knee, but she said she was "doing a lot of painting." R. 24. Presumably this was house painting, which requires a lot of standing and reaching. On May 4, 2006, Plaintiff was found to have normal strength in all extremities and a normal gait. *Id.* On May 31, 2006, Dr. Rowe, Plaintiff's treating physician, said that she should be limited to "light duty" "with frequent position changes." *Id.* On August 22, 2006, Plaintiff had normal strength in all extremities and her gait and station were normal. *Id.* In February and March, 2007, it was noted that Plaintiff experienced knee pain after her knee surgery but the medicines seemed to be helping. *Id.* She was "getting around better" after the knee aspiration injection, which seemed to have "helped a lot." *Id.* There was only "mild swelling" of the knee. *Id.* Plaintiff continued to do very well until April 5, 2007, when she fell. *Id.* After x-rays, she was diagnosed with "left knee mild degenerative joint disease" but surgery was not warranted. *Id.* Dr. Rowe's notes in the ensuing months, from April, 2007, to January, 2008, indicated that Plaintiff had "significant right knee pain and swelling," required a knee brace to walk, and had multiple injections, but mentions by Dr. Rowe of back pain were sporadic. *Id.* An EMG on July 11, 2007, after the knee surgery, revealed peroneal neuropathy without denervation or reinnervation, without likelihood of return of motor function of the nerve,

but "no clear cut EMG evidence of an L5 lumbosacral radiculopathy in the right lower extremity." *Id.* On August 17, 2007, Dr. Freid recommended that Plaintiff do physical therapy to improve knee mobility. *Id.* On January 4, 2008, Plaintiff had lost her cane and could not afford another, but was not wearing her leg brace all the time. *Id.* The ALJ concluded from all of this that Dr. Titus's residual functional capacity assessment was not correct, and that Plaintiff could do a limited range of sedentary work. R. 23-25.

All of these findings are supported by substantial evidence in the record discussed above. Plaintiff has been treated with significant pain medications for back and neck pain, but the most recent notes indicate that those conditions are stable with medication. Plaintiff's primary physical impairment are her knees, and knee impairments should not preclude sedentary employment. In summary, the first argument presented by Plaintiff for reversal of the ALJ's decision is not persuasive.

**Whether the ALJ erred in his evaluation of Plaintiff's pain testimony**

Plaintiff contends that the ALJ erred in her failure to believe Plaintiff's pain testimony. Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity. Social Security Ruling 96-8p, p. 4. Pain and other symptoms may affect either exertional or non-exertional capacity, or both. *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v.*

> *Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the
> reasons for discrediting subjective testimony requires, as a matter of law,
> that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d
> 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for

disregarding the claimant's subjective testimony must be based upon substantial

evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's standard

if his findings "leave no doubt as to the appropriate result" under the law.  Landry v.

Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

        "A claimant's subjective testimony supported by medical evidence that satisfies

the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain

situations, pain alone can be disabling, even when its existence is unsupported by

objective evidence."  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations

omitted).   "[W]here proof of a disability is based upon subjective evidence and a

credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ

must either explicitly discredit such testimony or the implication must be so clear as to

amount to a specific credibility finding."  *Id.* at 1562, *quoting*, Tieniber v. Heckler, 720

F.2d 1251, 1255 (11th Cir. 1983).

        Plaintiff argues that her "medical record is replete with objective evidence of

underlying medical conditions that would cause a person great pain."  Doc. 19, p. 20.

Plaintiff cites R. 275, 279-281, 312, 313, 326, 327, 330, 332, 335, 342, and 343.  *Id.*, pp.

20-21.  Plaintiff has not specifically identified the evidence that is intended by these

page citations, nor has Plaintiff argued how that evidence identified supports the argument made.

The first citation is to the MRI results, which showed "nonspecific areas" in the brain that can be seen in patients with migraine headaches, as well as with other issues. R. 275. In the evidence above from 2007 and 2008, Dr. Freid noted migraine headaches by history on January 9, 2007, R. 258, and Dr. Titus did so on March 13, 2007, May 10, 2007, and September 17, 2007. R. 449, 446, 442. On May 10, 2007, Dr. Titus said that Plaintiff's migraine headaches were clinically stable with Fiorinal. R. 446. On October 25, 2007, Dr. Titus again noted that Plaintiff's migraine headaches were well-controlled with Fiorinal. R. 441. There are no clinical findings as to the frequency and severity of Plaintiff's migraine headaches, and two notations indicate that the headaches are well-controlled with Fiorinal. This first record citation is not substantial evidence in the record to support Plaintiff's argument.

The second set of record citations is to three MRI results from February, 2006. One showed a lesion and a cyst on the right knee. R. 281. Plaintiff had surgery to correct the primary lesion. One MRI showed a normal right shoulder. R. 280. The third MRI showed a normal right scapula. R. 279. None of this is substantial evidence to support Plaintiff's argument that the record contains objective evidence of an underlying medical condition that would cause the pain Plaintiff described in her testimony.

The next set of record citations is to the MRI of Plaintiff's left knee on April 20, 2007. R. 312-313. Plaintiff was found to have "minimal subcortical marrow edema along the anterior peripheral aspect of the lateral femoral condyle" that "may represent

a focal area of bone contusion possibly secondary to direct trauma to this region." R. 312. The "marrow signal was otherwise normal." *Id*. The MRI also revealed "minimal grade II chondral changes of the medial patellar facet with mild thickening of the adjacent medical plica." *Id*. The MRI showed "small volume joint effusion." *Id*. It showed a "post surgical change at the level of the anterior tibial tuberosity without evidence or complication." *Id*. Finally, the MRI said: "no focal meniscal tear identified." *Id*. The findings appear to be consistent with some pain in the left knee, but generally seem to be mild. It is not evidence of an inability to perform a sedentary job.

The next set of citations is to R. 326-327, which is the MRI of Plaintiff's lumbar spine on May 23, 2006. All of the findings are mild disc degeneration, from L1-S1, with no stenosis from L1 through L5, and moderate disc degeneration at L5-S1, but without displacement of the S1 nerve roots. R. 326. This likewise is evidence of a condition that could cause some pain, but there is little comment in the medical record about the seriousness of Plaintiff's spinal condition.

Plaintiff cites to R. 330-331, which is an MRI of her cervical spine on May 1, 2006. The findings at C3-4 were normal. R. 330. Only mild disc dessication was found at the other cervical levels. *Id*. The impression was "minimal disc dessication in mid cervical spine. No evidence for neural encroachment in the cervical spine." *Id*. This is not objective medical evidence of a cervical condition that would cause the pain alleged by Plaintiff.

The next record citation by Plaintiff is to a CT scan of her right knee on May 25, 2006. R. 335. The impression was degenerative changes of the right knee "most

marked involving the lateral femoral condyle with small subchondral cysts and sclerosis of the articular surface." *Id*. This finding appears to be consistent with Plaintiff's complaints of pain in her right knee, but is not evidence that Plaintiff is incapable of doing sedentary work.

The last record citation concerns the EMG evidence that Plaintiff suffered peroneal neuropathy after her knee surgery. R. 342-343. The study said that "further motor function return of this nerve is unlikely." R. 342. There was also a determination of "no clear-cut emg evidence of an L5 lumbosacral radiculopathy in the right lower extremity." R. 343. The latter finding is consistent with the MRI of Plaintiff's lumbar spine, showing only mild to moderate disc degeneration and no nerve impingement. The finding of peroneal neuropathy seems to be a finding of impairment of motor function, not a finding of a cause of pain. It is consistent with other evidence that Plaintiff has a damaged right knee, must wear a brace, and should walk with a cane. All of this is evidence that Plaintiff suffers some pain in her right knee, but not to the degree that she cannot do a sedentary job.

In summary, the argument Plaintiff makes concerning the ALJ's evaluation of her credibility as to the degree of pain she experiences is not persuasive.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and correctly followed the law. The decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on April 29, 2010.

                              s/    William C. Sherrill, Jr.
                              **WILLIAM C. SHERRILL, JR.**
                              **UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**